UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
TRAVIS LONDON,

        Plaintiff,
                                                          **COMPLAINT**

        v.

LAPO EDOVARD ELKANN,                            **JURY TRIAL**
                                                             **DEMANDED**

        Defendant.
-----------------------------------------------------------------x

        Plaintiff, TRAVIS LONDON (the "Plaintiff"), by and through his attorneys, Exemplar Law, LLC, for his Complaint against defendant LAPO EDOVARD ELKANN (the "Defendant") hereby alleges as follows:

## NATURE OF THE CASE

1.    This case is brought by Plaintiff, an American citizen and New York resident who is the former boyfriend and love interest of Defendant, for damages that he incurred on or about the evening of July 18, 2018 at Defendant's residence in Milan, Italy.  After engaging in sexual relations with Defendant during a vacation from New York, Defendant, without Plaintiff's knowledge or consent, contacted two (2) transsexual prostitutes to come to his residence.  With Defendant's full knowledge, and at Defendant's behest, one of the transsexual prostitutes sexually assaulted an unwilling Plaintiff, who suffered both physical and psychological injuries as a result. At the same time, Plaintiff was compelled to watch, against his will, as Defendant, who he had intimate relations with since on an off-and-on basis since 2013, engaged in extensive sexual acts with the second transsexual prostitute just a short time after the Parties themselves had unprotected sexual relations.  This incident was the latest in a series of abusive, manipulative, demeaning, and harmful episodes

1

initiated by Defendant during the course of an abusive multi-year courtship. Rather than try to make amends, aside from an initial apology and bid to beg for forgiveness, Defendant soon sent attorneys from his family's company, Fiat, and well as his own personal attorneys in the United States to intimidate Plaintiff into silence about the subject incident through a series of frivolous, defamatory cease and desist letters, which only served to amplify the psychological suffering of Plaintiff arising from both the subject incidents and their entire relationship as a whole. The instant action follows wherein Plaintiff seeks redress for the July 18, 2018 assault and infliction of emotional distress upon him.

## THE PARTIES

2. Plaintiff is an individual who, at all relevant times, is a United States citizen and is and was a resident of either Manhattan, County of New York, State of New York or Brooklyn, County of Kings, State of New York. From 2013 through July 18, 2018, Plaintiff was in an off-and-on intimate relationship with Defendant. At the time that they first met, Plaintiff was a well-regarded, internationally renowned chef who had many relationships with celebrities and international business people. He has since transitioned into the world of interior design, where he has recently gained notoriety after press coverage of his recent New York City residence. The transition, in part, was caused by an earlier incident in the Parties' courtship which ruined many of the relationships that Plaintiff had for the advancement of his culinary career.

3. Defendant is an individual who, at all relevant times, had a number of residences internationally, including in Milan, Italy, where the subject incidents took place, and in the United States. He is reportedly a billionaire in his native Italy, where he and his family have accumulated vast wealth through, inter alia, a controlling interest in European

automotive powerhouse Fiat, and a wide range of other business interests. Defendant has a documented history of alleged involvement with transsexual escorts and prostitutes. He has repeatedly gone great lengths to deny even knowing Plaintiff, despite a palpable amount of available evidence to the contrary, as part of his effort to disguise their history of intimate relations, including repeated threats of legal action and false statements to those in the international press.

## JURISDICTION, VENUE, AND STANDING

4.  This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the Parties as Defendant, who is not an American citizen, committed torts against Plaintiff, a citizen of the United States and resident of the State of New York, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

5.  Personal jurisdiction is proper over Defendant in this district pursuant to C.P.L.R. § 302(a)(3) and 302(a)(4), and Federal Rule of Civil Procedure 4(k) as Defendant, through his ownership of EXOR, a holding company, operates several businesses with offices in Manhattan, County of New York, City of New York, conducts extensive commerce in the State of New York through same, has knowingly and willingly fostered a multi-year, off-and-on intimate relationship with Plaintiff, a New York resident, lured Plaintiff to come from New York to Milan for the trip which led to the subject incidences including by paying for the trip, and has employed his New York-based attorneys as an extension of himself to communicate written threats against Plaintiff since the subject incidents occurred in an effort to silence him. In addition, Defendant is the majority

3

shareholder of an eyewear company named Italia Independent which, upon information and belief, maintains a place of business in Florida.

6. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 (a)(3). The acts and transactions complained of herein occurred in Milan, Italy against Plaintiff, who resides in this Judicial District, and give the Court personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

7. Parties first met in 2012. Over the year that followed, the Parties became friends. The friendship transitioned into an intimate, physical relationship in 2013.

8. Following a situation involving the press, the Parties broke up in the beginning of 2014, shortly prior to Easter. At the time, Defendant told Plaintiff that he was going to rehabilitation and needed time to get himself better/healthier before working on their relationship any further.

9. Plaintiff subsequently posted a message on Twitter alluding to the relationship between himself and Defendant which was picked up by a news outlet. Defendant put out a statement in response denying Plaintiff's tweet and accusing him of stalking Defendant for the prior year-and-a-half.

10. The backlash from Defendant's denial destroyed many of Plaintiff's then-current business relationships and resulted in his having to close his catering business and cancel negotiations for a deal with the Home Shopping Network, among other problems it created.

11. Despite Defendant's denial of their intimate relationship in the press in 2014, the Parties nonetheless reconciled and began dating again in January of 2015.

12. Between January of 2015 and July 18, 2018, the Parties had an off-and-on intimate relationship which would effectively cease when Defendant had his attorneys send Plaintiff a cease-and-desist letter and then resume when Defendant invariably contacted Plaintiff to reconcile.

13. One such break-up occurred around New Years Eve, December 2015. After that time, Parties did not talk in 2016 or 2017.

14. Defendant reached out to Plaintiff to most recently rekindle their relationship in March of 2018.

15. Thereafter, in June of 2018, Defendant lured, or otherwise strongly encouraged, Plaintiff to leave his residence in New York, where he knew Plaintiff to regularly reside and where he himself had once lived for a time after being born in New York, for a vacation to visit him in Paris, France, for which he paid for Plaintiff's travel. Plaintiff subsequently traveled to Paris with friends for that express purpose before receiving a text message from Defendant that he would not be meeting him in France.

16. Defendant then, however, arranged for Plaintiff to meet him in Milan, Italy the week after he arrived in Paris. They did so, and resumed their intimate relationship with one another during the visit. Defendant paid for Plaintiff's travel from Paris to Milan.

17. On July 18, 2018, two (2) days after Plaintiff's birthday, Defendant contacted Plaintiff, who was staying at an apartment one (1) block away, to see if he wanted to come by his Milan residence for a "birthday surprise." Plaintiff went over to Defendant's residence where they proceeded to engage in unprotected sexual activity.

18. After they finished having unprotected sexual relations, Defendant excused himself to purportedly go downstairs and get his pajamas. When he returned, Defendant

5

was on the phone with someone speaking Portuguese, a language which Plaintiff does not speak nor understand.

19. Shortly after Defendant returned upstairs on his phone, two (2) transsexual prostitutes and their madame came to Defendant's door.

20. After Plaintiff refused to engage in a ménage a trois with Defendant and one of these transsexual prostitutes, who he had apparently been dating beforehand, Defendant immediately began engaging one of the prostitutes in sexual activity and supplied them both with cocaine. Plaintiff watched in shock as the individual he had engaged in unprotected sexual relations just a little while earlier engaged in such acts as oral sex, and later intercourse, with one of the transsexual prostitutes.

21. At the same time, the second transsexual prostitute, with Defendant's knowledge and at his behest, aggressively endeavored to get Plaintiff to engage in sexual activity, including by trying to pull him onto a bed, brushing genitalia up against Plaintiff, and aggressively inserting fingers into Plaintiff's rectum against his will and without his consent.

22. In the middle of his resisting the sexual assault of the transsexual prostitute, Plaintiff was warned, via a phone call to the madame's phone from an unknown individual, to "act right" or else he would not "make it out of Italy." Further, under duress from both Defendant and the prostitutes, Plaintiff did not feel as if he even had the option of leaving for a time. The combination of threats and actions resulted in Plaintiff effectively freezing for a time and thus not immediately fleeing Defendant's residence.

23. Plaintiff ultimately fled Defendant's apartment that evening after a verbal confrontation with Defendant about the transsexual prostitutes and his assault by the one whom Defendant himself was not involved with.

24. Plaintiff suffered rectal bleeding as a result of the transsexual prostitute's advances and suffered about a week-and-a-half of irritation in his rectal/anal region as a result.

25. The following day, on July 19, 2018, Defendant contacted Plaintiff by phone and text messages to acknowledge that he hurt Plaintiff with his actions and that Plaintiff sustained physical injury at the hands of the transsexual prostitute that was hired and encouraged by him, repeatedly apologize, and beg that he not take legal action.

26. Plaintiff ultimately agreed to meet Defendant at the Four Seasons in Milan that day as long as he could keep a security guard with him at all times since he no longer trusted Defendant and was afraid of him after the prior night's actions. Plaintiff agreed to get help for himself, and suggested they then go to couples' therapy.

27. On July 27, 2018, nine (9) days after the incident at Defendant's residence, Defendant left Plaintiff a voice message telling Plaintiff that he was "special," a "beautiful human being," and that he was "lucky" to have him in his life and apologizing to him again for what happened on July 18, 2018.

28. Thereafter, on July 31, 2018, Defendant came to Plaintiff's apartment in Milan to talk further about the July 18, 2018 incident and apologized further for same.

29. Defendant advised Plaintiff during the post-July 18, 2018 discussions that it was important that Plaintiff not take any legal action since he wanted to avoid a scandal following the passing barely a week after the subject incidents of Sergio Marchionne, the

7

former CEO of Ferrari and Fiat Chrysler Automobiles, since Defendant was deeply involved in their operations as well, and their stockholders and the public were never informed of Mr. Marchionne's illness and were thus blindsided by his death and thus already reeling as a result of same.

30. Despite repeated written and oral apologies, and a continued pursuit of Plaintiff after the July 18, 2018 incidents, Defendant changed his tone entirely by August 12, 2018 and had his New York-based attorneys author a cease and desist letter directing Plaintiff to cease social media activity purportedly pertaining to him and to stop his alleged harassment and stalking of Defendant, despite ready evidence that it was Defendant harassing and stalking him afterwards to seek forgiveness and avoid legal action.

31. The August 12, 2018 cease and desist letter was followed up by a November 15, 2018 cease and desist letter from "the Italian Lawyer" of Defendant who is and was connected with his family's work in Fiat and other business interests. The letter essentially reiterated the same threats and claims made in the August 12, 2018 letter and concludes with a threat to contact the authorities. This particular letter was especially intimidating to Plaintiff given Defendant's family's lofty, well-connected status in Italy.

32. In addition to using his legal counsel on two separate continents to send cease and desist letters to Plaintiff, Defendant also advised him on at least one occasion that if Plaintiff did not sign a non-disclosure agreement regarding their intimate activities, he was a billionaire and would spend millions of dollars to make Plaintiff's life miserable. At least some of that money Defendant advised Plaintiff of having was reportedly used to buy the transsexual prostitutes' silence after the July 18, 2018 incidents. They

8

subsequently took down their social media profiles just weeks before the filing of this matter.

33. The instant action follows, as Plaintiff is both seeking redress for the emotional and physical injuries that he sustained in the July 18, 2018 incidents, as well as a definitive end to the ceaseless threats and harassment by Defendant and his New York and Italian attorneys.

**FIRST CAUSE OF ACTION**
**(SEXUAL ASSAULT)**

34. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 33 of the Complaint as if fully set forth at length hereat.

35. On July 18, 2018 at his residence in Milan, Italy, Defendant knowingly placed Plaintiff in imminent apprehension of harmful contact by subjecting Plaintiff to the unwanted, aggressive, and persistent sexual advances of one of the transsexual prostitutes that he hired to come to his residence to engage in sexual activity.

36. Plaintiff was not previously told that any transsexual prostitutes would be involved in the day's sexual activities and repeatedly expressed his strong discomfort to Defendant upon the arrival of the transsexual prostitutes hired by Defendant, but was ignored by Defendant who instead encouraged Plaintiff to participate in group sexual activity with the transsexual prostitutes, placing Plaintiff in imminent apprehension of harmful contact.

37. By virtue of the fact that Defendant hired the transsexual prostitute without Plaintiff's knowledge or consent and encouraged and directed said prostitute to

9

aggressively pursue sexual activity with Plaintiff despite his express lack of desire or consent to engage with same, Defendant committed sexual assault upon Plaintiff.

38. Accordingly, Defendant is liable to Plaintiff for damages in an amount to be determined by the Court, together with the costs of this action.

## SECOND CAUSE OF ACTION
## (SEXUAL BATTERY)

39. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 38 of the Complaint as if fully set forth at length hereat.

40. On July 18, 2018 at his residence in Milan, Italy, a transsexual prostitute, acting at the encouragement and behest of Defendant, and against the express will of Plaintiff, intentionally made bodily contact with Plaintiff, including unwanted groping, touching, and the insertion of fingers into Plaintiff's rectum causing bleeding, that was offensive in nature to Plaintiff.

41. By virtue of the fact that Defendant hired the transsexual prostitute and encouraged said prostitute to aggressively pursue sexual activity with Plaintiff despite his lack of desire or consent to engage with same, and because offensive contact occurred as a direct and foreseeable result of Defendant's actions, Defendant actively aided in the commission of sexual battery of Plaintiff.

42. Accordingly, Defendant is liable to Plaintiff for damages in an amount to be determined by the Court, together with the costs of this action.

## THIRD CAUSE OF ACTION
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

43. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 42 of the Complaint as if fully set forth at length hereat.

44. On July 18, 2018, Defendant willfully, and indeed at his behest, allowed for Plaintiff, whom he had engaged in unprotected sexual relations with only a little while earlier, to be sexually assaulted and battered by a transsexual prostitute that he had hired despite Plaintiff's express and repeated objections to engaging in any activity at all with either the transsexual prostitute who made contact with him, or the transsexual prostitute who Defendant had wanted him to join in a ménage a trois with him.

45. On July 18, 2018, Defendant willfully subjected Plaintiff, whom he had engaged in unprotected sexual relations with only a little while earlier, and who had traveled from New York to Paris, and then Milan, at his request to seek Defendant's physical affections only, to watch Defendant, engage in extensive, unprotected sexual activity with a transsexual prostitute, including both oral sex and anal intercourse.

46. Finally, since July 18, 2018 through the current date, Defendant, after engaging in the aforementioned acts detailed in this Third Cause of Action, used his attorneys in both New York and Italy to harass, bully, intimidate, and attempt to silence Plaintiff and prevent him from discussing the above-detailed conduct in any setting, seemingly cognizant of the potential criminal and civil claims that could made by Plaintiff.

47. Each of these aforementioned acts constitutes extreme and outrageous conduct that is beyond the reasonable bounds of decency tolerated by a decent society.

48. Defendant's conduct in connection with each of the aforementioned acts amounted to a disregard of a substantial probability of causing Plaintiff severe emotional distress.

49. As a result of Defendant's aforementioned outrageous, offensive, and egregious conduct, Plaintiff has suffered severe emotional distress.

50. Based upon Defendant's aforementioned outrageous, offensive, and egregious conduct, Plaintiff is entitled to receive an award of punitive damages in addition to his compensatory damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment in his favor and against Defendant awarding Plaintiff compensatory damages in an amount to be determined at trial, but in no event less than Ten Million U.S. Dollars ($10,000,000.00 U.S.) according to proof at trial, plus punitive damages at an amount to be determined at trial, reasonable attorneys' fees, litigation costs, and expenses according to statute, pre-judgment interest, and such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims alleged herein.

Dated: New York, New York
       May 31, 2019

**EXEMPLAR LAW, LLC**

By: _____/s/_____
       PAUL S. HABERMAN (PH 2771)
       Special Counsel
       Attorneys for Plaintiff
       200 Park Avenue, Suite 1700
       New York, New York 10166
       (201) 564-0590: Phone
       phaberman@exemplarlaw.com: E-Mail
       psh@paulhabermanlaw.com